# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 25-8** |
| **MARY BLAKLEY** | : | |
| a/k/a "Marye Blakley" | | |
| a/k/a "Mary Blakely" | : | |
| a/k/a "Mary Blakeley" | | |
| a/k/a "Mary Davis" | : | |
| a/k/a "Mary Venable" | | |
| a/k/a "Mary Cammer" | : | |
| a/k/a "Rosemary Cammer" | | |
| a/k/a "Rosemary Davis" | : | |
| a/k/a "Yvonne Davis" | | |
| a/k/a "Mary Blaksley" | : | |
| **FRED BLAKLEY** | | |
| a/k/a "Fred Blakely" | : | |
| a/k/a "Floyd Blakely" | | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, Ruth Mandelbaum, Assistant United States Attorney for the District, and Alexander B. Bowerman, Special Assistant United States Attorney for the District, respectfully submits this trial memorandum to assist the Court during the trial scheduled to begin on January 20, 2026.

## I.       THE INDICTMENT

On June 5, 2025, the grand jury returned a superseding indictment (the "indictment") charging Mary Blakley and Fred Blakley (the "defendants") with one count of conspiracy to commit mail and wire fraud (Count 1), four counts of wire fraud (Counts 2-5), three counts of

mail fraud (Counts 6-8), and one count of conspiracy to defraud the United States and violate the Food, Drug, and Cosmetic Act (the "FDCA") (Count 9).

## II.    <u>FACTUAL BACKGROUND</u>

The indictment alleges that the defendants engaged in a long-lasting, multi-jurisdictional scheme to defraud. The defendants operated purported medical clinics in multiple states, including Arizona, California, and Colorado, where they offered purported medical treatment to the public at large (the "Blakley Clinics"). Through undercover operations, review of documents and devices, and information provided by clients of the Blakley Clinics and associates of the defendants, the government learned how the defendants operated their scheme.

At the center of the scheme was the "full body scan" conducted by Mary Blakley for approximately $300, typically paid in cash or check only. The scans were conducted using conventional ultrasound machines. The defendants and their co-conspirators claimed that these full body scans could detect, treat, and cure various illnesses, including cancer. The defendants claimed that the machine had special capabilities because it contained proprietary "smart chip" technology. Mary Blakley described this technology, frequently in Fred Blakley's presence, as either hardware or software that could be programmed into the ultrasound machine, "pushed" remotely into the machine, or otherwise installed in the machine. Mary Blakley claimed that she had invented the software or that it had been invented by the United States military. Consistently, Mary Blakley claimed that the software was secret, should not be talked about around others, and could be erased with the click of a button.

As shown in undercover recordings and corroborated by clients and associates, the full body scan followed a typical pattern. Mary Blakley would scan various areas of the client, measuring organs, opining on the health of the various organs, and periodically "activating the

chip" or "lighting it up like a Christmas tree" to determine whether cancer cells were present. When she did detect cells, she would activate a "laser" on the machine to "drive" a cosmetic cream, called Aetheion, into the client to purportedly kill the cells. During the scan, Mary Blakley also claimed to conduct a non-invasive colonoscopy; if necessary, what she termed a "biopsy"; a prostate exam and evaluation of prostate specific antigen levels in male clients; and, sometimes, an electrocardiogram ("EKG"). She also claimed to scan the client's brain stem to detect scarring, measure bone density, evaluate blood flow, detect arterial age, and measure immune system levels. If necessary, she claimed to "blast" kidney stones using the machine's "laser." Towards the end of the scan, Mary Blakley would clean out what she claimed to be toxins, shedding, or scarring on the lungs using what she claimed to be a more powerful machine. By the end of 2023, Mary Blakley claimed to complete the lung cleaning using a unique prototype "sweeper" machine. There is no evidence that the machines used by the defendants had any special technology or that they could conduct most of the actions that the defendants claimed they could.

During the scanning process, an additional co-conspirator was often present to record the results of the scan. This person, known as the "charter," was directed by Mary Blakley to write down various measurements and circle, on the back of the sheet, various products recommended to treat purportedly diagnosed conditions. At the end of the scan, the defendants encouraged the client to return regularly for evaluations.

The defendants furthered their scheme by directing clients of the Blakley Clinics to purchase various substances and supplements to treat, cure, and prevent the diseases diagnosed during the scans. While the defendants directed some clients to order substances online, the defendants also offered some substances for sale inside the Blakley Clinics. Initially, Fred

Blakley sold the substances, but the defendants soon outsourced this sales function to others, specifically Janmarie Lanzo (also charged in this indictment) and Steven Seely (charged in 25-cr-389).

The indictment names three substances in particular prescribed by the defendants and their co-conspirators: (1) Aetheion (referenced above), which comes in the form of a lotion to be rubbed over the body and is advertised in the mainstream as a cosmetic product and skin therapy antioxidant moisturizer that strengthens skin against daily external aggressors; (2) fenbendazole, in various forms (including Panacur and Fenben Bio), an antiparasitic that is the active ingredient in an animal drug and approved by the Food and Drug Administration (the "FDA") for use in many different animal species, but not for use in humans; and (3) ProArgi9, an l-arginine supplement, manufactured and distributed through Synergy Worldwide, a multi-level marketing company. Both defendants, and their co-conspirators, promoted Aetheion and fenbendazole to treat, cure, and prevent cancer and other diseases. The defendants and co-conspirators promoted ProArgi9 to treat various cardiovascular diseases and prevent heart attacks and strokes.

These substances did not bear labels containing adequate directions for use in treating and preventing these various conditions and were, therefore, misbranded under the FDCA.

The defendants also profited by franchising their clinics. The defendants trained others to conduct Mary Blakley's scanning procedure, charging approximately $20,000 for the training program. The defendants ensured that her trainees would not operate in the same states where she worked to avoid any competition.

To promote their clinics, and gain the trust of potential clients, the defendants made various false and misleading claims touting Mary Blakley's background and credentials. Mary Blakley, often in Fred's presence, claimed that she held dual U.S.-Swedish citizenship and was

able to learn the techniques and methods she employed by practicing European medicine in Sweden. In fact, she was born in Texas and has never left the United States.

On the wall of the clinic office, the defendants hung various diplomas purporting to show that Mary Blakley had obtained a Ph.D. in nuclear physics from the Karolinska Institutet in Sweden and Ph.D. degrees in "training and development" from Gatesville University and Almeda University. Mary Blakley frequently bragged about her time and studies at the Karolinska Institutet. However, Mary Blakley never attended the Karolinska Institutet. Moreover, Gatesville University and Almeda University are sham universities, often referred to as diploma mills.

The defendants also claimed that Mary Blakley had spent approximately thirty years working at MD Anderson Cancer Center in Houston, Texas and had worked to develop fenbendazole while employed at Merck & Co., a pharmaceutical company. The evidence will show, however, that Mary Blakley was never employed at either institution. In fact, for a period of about five years when she was purportedly working in the medical field, Mary Blakley was incarcerated on federal drug trafficking charges.

The defendants took various active measures to shield their clinics from government scrutiny. They frequently changed the location and names of their clinics, asked to be paid in cash (and sometimes checks) so they could not be tracked, refused to keep client records, recorded clients only by their first names, and set up their business as a private membership association to try and prevent government regulation and interference. The defendants instructed trainees and associates not to use the phrases "prescribe" or "diagnose." They attempted to avoid using "disease terms" like "cancer," which they referred to as "bad cells" or "PAD" (peripheral arterial disease)—though they often did not follow their own advice. They claimed that they

were only conducting "research," but followed no typical research protocols; in fact, they refused to keep any documentation of the scans they performed, which would be necessary to document and evaluate the results of any actual research.

This scheme forms the basis of the charges in the nine-count indictment.

## III.    STATUTES CHARGED AND ELEMENTS OF THE OFFENSES

### A.    Conspiracy to Commit Wire and Mail Fraud, 18 U.S.C. § 1349 (Count 1)

To prove conspiracy to commit wire and mail fraud, the government must prove the following elements beyond a reasonable doubt as to each defendant:

First:       Two or more persons agreed to commit mail or wire fraud;

Second:   The defendant was a party to or a member of that agreement; and

Third:      The defendant joined the agreement or conspiracy knowing of its objectives to commit mail fraud or wire fraud and intending to join together with at least one other alleged coconspirator to achieve that objective.

*See* Third Circuit Model Jury Instruction (Criminal) 6.18.371A.

### B.    Wire Fraud, 18 U.S.C. § 1343 (Counts 2-5)

To prove wire fraud, the government must prove the following elements beyond a reasonable doubt with respect to each defendant:

First:       The defendant knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations, or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature);

Second:   The defendant acted with the intent to defraud; and

Third:      In advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or

television communication in interstate commerce or caused the transmission

of any writing, signal, or sound of some kind by means of a wire, radio, or

television communication in interstate commerce.

*See* Third Circuit Model Criminal Jury Instruction (Criminal) 6.18.1343.

### C. Mail Fraud, 18 U.S.C. § 1341 (Counts 6-8)

To prove mail fraud, the government must prove the following elements beyond a

reasonable doubt with respect to each defendant:

First: The defendant knowingly devised a scheme to defraud or to obtain money or

property by materially false or fraudulent pretenses, representations, or

promises (or willfully participated in such a scheme with knowledge of its

fraudulent nature);

Second: The defendant acted with the intent to defraud; and

Three: In advancing, furthering, or carrying out the scheme, the defendant used the

mails, or caused the mails to be used.

*See* Third Circuit Model Criminal Jury Instruction (Criminal) 6.18.1341.

### D. Conspiracy to Defraud the United States and Commit an Offense Against the United States, 18 U.S.C. § 371 (Count 9)[1]

To obtain a conviction for conspiracy defraud the United States, in violation of 18 U.S.C.

§ 371, the government must prove the following elements beyond a reasonable doubt with

respect to each defendant:

---

[1] The government charges a two-pronged conspiracy in Count 9: conspiracy to defraud the United States and to commit an offense against the United States by violating the FDCA. These are two alternative ways to commit a single conspiracy offense. *See United States v. Rigas*, 605 F.3d 194, 203-12 (3d Cir. 2010).

First:     Two or more persons agreed to "defraud the United States" as charged in the indictment. "Defraud the United States" means to cheat the United States government or any of its agencies out of money or property. It also means to obstruct or interfere with one of the United States government's lawful functions by deceit, craft, trickery, or dishonest means.

Second:    The defendant was a party to or a member of that agreement.

Third:     The defendant joined the agreement or conspiracy knowing of its objective to defraud the United States and intending to join together with at least one other conspirator to achieve that objective.

Fourth:    At some time during the existence of the agreement or conspiracy at least one of its members performed an overt act in order to further the objective of that agreement.

*See* Third Circuit Model Jury Instruction (Criminal) 6.18.371B.

To obtain a conviction for conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, the government must prove the following elements beyond a reasonable doubt with respect to each defendant:

First:     Two or more persons agreed to commit an offense against the United States, here, to violate the FDCA;[2]

Second:    The defendant was a party to or member of that agreement;

---

[2] To prove the substantive offense of violating the FDCA by introducing misbranded articles into interstate commerce, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), the government must prove: (1) the substance was a drug; (2) the defendant distributed the drug or caused the drug to be distributed in interstate commerce; (3) the drug was misbranded; and (4) the defendant acted with an intent to defraud or mislead (for a felony).

Third:   The defendant joined the agreement or conspiracy knowing of its objective to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve that objective; and

Fourth:  At some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

*See* Third Circuit Model Jury Instructions (Criminal) 6.18.371A.

## IV.   EVIDENTIARY MATTERS AND LEGAL ISSUES

### A.   Non-hearsay Evidence

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Rule 801 prohibits the admission of an out-of-court statement offered to prove the truth of the matter asserted because "the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined." *United States v. Pelullo*, 964 F.2d 193, 203 (3d Cir. 1992).

There are two ways to overcome a potential hearsay problem: First, the proponent can rely on the statement not for the truth of the matter asserted, but for another purpose. Second, there exist many exceptions to the hearsay rule which deem particular pieces of evidence sufficiently reliable to come into the record for their truth, despite their out-of-court nature.

In this case, the government may introduce several out-of-court statements by non-defendants and non-co-conspirators. These statements include comments made by clients or others on video recordings or in electronic communications involving the defendants. Some of

these statements are not assertions, for example, questions asked of the defendants. Other statements will not be offered for the truth of the matter but rather to show the effect on the listener (*i.e.*, the defendants) and to provide context for the defendants' statement. Such statements are not hearsay or are admissible pursuant to an exception to the rule against hearsay.

## B. Admissions by the Defendants

The government intends to introduce admissions made by the defendants, including statements made on undercover recordings, video interviews of Mary Blakley posted on YouTube,[3] statements and advertisements by the defendants in newspapers,[4] videos saved on

---

[3] Specifically, the government intends to introduce several videos posted to the YouTube account "HealthScreeningsByMaryBlakley" in April and May 2020 in which defendant Mary Blakley is interviewed. During the interviews, Mary Blakley makes false claims about her background and the capabilities of her ultrasound machine, including its ability to detect cancer. Records obtained from YouTube (pursuant to a trial subpoena) indicate that this YouTube account is registered to the name "HealthScreeningsByMaryBlakley," and, as the government will demonstrate at trial (including through undercover testimony and documents seized from the Blakley Clinics), one of the company names used by the defendants was "Health Screenings 4 Life." The government will introduce these videos through the testimony of one or more law enforcement witnesses who downloaded the videos from YouTube and can identify Mary Blakley in the videos, including based on personal interactions with her. *See, e.g.*, *United States v. Pettway*, No. 1:12-CR-103, 2018 WL 4958962, at *4-5 (W.D.N.Y. Oct. 15, 2018), *aff'd sub nom. United States v. Washington*, 814 F. App'x 664 (2d Cir. 2020) (where government "introduced a video obtained from YouTube that contained images of the Defendant rapping," testimony of agent (i) explaining that video was obtained from YouTube and (ii) identifying defendant as the person shown in the video (based on the agent's interactions with the defendant) satisfied Rule 901); *United States v. Washington*, No. 16-CR-477, 2017 WL 3642112, at *2 (N.D. Ill. Aug. 24, 2017), *aff'd*, 962 F.3d 901 (7th Cir. 2020) (similar); *see also, e.g.*, *United States v. Vazquez-Soto*, 939 F.3d 365, 374 (1st Cir. 2019) (similar, for photographs of defendant obtained from his ex-wife's Facebook page); *United States v. Williams*, No. CR 19-204, 2025 WL 932771, at *2-3 (E.D. La. Mar. 27, 2025) (similar, for screenshots of Instagram Live video); *United States v. Oreckinto*, 234 F. Supp. 3d 360, 365 (D. Conn. 2017) (similar, for photograph of defendant from spouse's Facebook page and internet photograph showing similar clothing).

[4] Specifically, the government has obtained copies of articles in a Colorado newspaper, The Steamboat Local (which is no longer in circulation), from December 2010 written by Mary Blakley, as well as an advertisement for one of the Blakley Clinics (called "U-Care") featuring a picture of Mary Blakley. The statements by Mary Blakley in her articles, which tout her credentials and make claims about her ultrasound scanning capabilities, are admissible under Rule 801(d)(2)(A). The articles are written in the first person, indicating the statements are Mary

Fred Blakley's phone, and recorded post-arrest interviews, *see* ECF 81, and through testimony of various witnesses who interacted with the defendants, including clients of their clinics, the case agent who interviewed Mary Blakley post-arrest, and the undercovers. A defendant's statement is never considered hearsay when offered by the government. Fed. R. Evid. 801(d)(2)(A); *see also United States v. Reilly*, 33 F.3d 1396, 1410 (3d Cir. 1994). Rather, the statement is an admission, and it does not require any special guarantee of trustworthiness. *See United States v. Singleterry*, 29 F.3d 733, 736 (1st Cir. 1994). Rule 801(d)(2) "does not limit an admission to a statement against interest," *United States v. Turner*, 995 F.2d 1357, 1363 (6th Cir. 1993), or limit admissions to statements made to co-conspirators. *United States v. Water*, 138 F. App'x 460, 462 (3d Cir. 2005).

Additional Confrontation Clause issues arise when admitting a testimonial statement of a defendant. As discussed above, the government seeks to admit certain statements made by the defendants during post-*Miranda* interviews on the day of their arrests. Consistent with the decision in *Bruton v. United States*, 391 U.S. 123, 126 (1968), in which the Supreme Court held that the use of a non-testifying co-defendant's confession which named a second defendant violated the second defendant's right to confrontation under the Sixth Amendment, and its progeny, the government will: (1) have its witnesses eliminate references to the other defendant when describing testimonial statements of one of the defendants, to the extent that they exist; and (2) will redact the recordings

---

Blakley's own. The articles also contain a box setting forth Mary's credentials written in the third person. While these portions nevertheless appear to be written by Mary, as they make the same claims she has made elsewhere (including that she attended the "Karolinska Institute"[sic] in Sweden), they are also not hearsay because they are not offered to prove the truth of the matter asserted; the government intends to prove at trial that Mary Blakley's claims about her credentials are false. Likewise, the advertisement for the Blakley Clinic is admissible under Rule 801(d)(2)(A) and/or 801(d)(2)(D). The newspapers themselves are self-authenticating under Rule 902(6).

of such statements to eliminate references to the other defendant, to the extent such references exist. Such redactions will remove direct reference to the co-defendant, not obviously indicate that they have been redacted, and be accompanied by a limiting instruction. *See Samia v. United States*, 599 U.S. 635, 653 (2023) (holding that "the *Bruton* rule applies only to 'directly accusatory' incriminating statements, as distinct from those that do 'not refer directly to the defendant'" and approving of the admission of redacted statements with a limiting instruction) (quoting *Gray v. Maryland*, 523 U.S. 185 , 194, 196 (1998)). The government will provide defense counsel with its proposed redactions in advance of trial so that any disputes can be brought to the Court if necessary. If warranted, the government will also propose an appropriate limiting instruction.

### C.     The Defendants' Use of Their Own Statements Barred

As explained above, a number of statements of the defendants will be introduced by the government in this case as admissions of a party opponent under Federal Rule of Evidence 801(d)(2). Such statements, however, may *not* be admitted by the defendants because Rule 801(d)(2) does not allow a party to "to introduce his or her *own* statements through the testimony of other witnesses." *See United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (emphasis in original). Indeed, if such statements were admissible, "parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *Id*. It does not matter whether the information the defendant seeks to admit is inculpatory or exculpatory. *Id.* at 545 n.2. In either case, a party simply cannot admit his or her own statements as admissions of a party opponent.

Therefore, if the statements by the defendants are not offered by the government, the statements are not admissible through cross-examination of the government's witnesses. Any attempt by the defendants to elicit them from the government's witnesses would be an attempt to

elicit hearsay. The statements would be offered by the defendant for their truth, Fed. R. Evid. 801(c), and would impermissibly enable the defendants to introduce their own self-serving statements through the government's witnesses without subjecting the defendants to cross-examination. *United States v. Willis*, 759 F.2d 1486, 1501 (11th Cir. 1985); *United States v. Woosky*, 761 F.2d 445, 449 (8th Cir. 1985); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988).

### D. Statements by the Defendants' Agents and Co-conspirators

As part of its case-in-chief, the government will introduce at trial certain statements by individuals who worked at or with the Blakley Clinics. Some of these individuals were charged (e.g., Janmarie Lanzo, 25-cr-8, and Steven Seely, 25-cr-389). Other individuals (including Roxanne Seely, Dacia Holm, Sharron Bartolis, and Just Bee) were not charged, but nonetheless assisted Mary Blakley with documenting (or "charting") during clients' body scans, selling products, scheduling and communicating with patients, and other tasks. Still other individuals were trained to open franchises of the Blakley Clinics (including Steven Kacenga, Rachel Kacenga, and Just Bee). Because (i) the statements that the government will introduce were made while these individuals were acting on behalf of the Blakley Clinics (usually while the declarants were physically at the Blakley Clinics), and (ii) the statements perpetuated the fraudulent scheme at the Blakley Clinics by promoting sham treatments, touting false credentials, and selling misbranded drugs, the statements are admissible as statements by an agent of a party opponent under Federal Rule of Evidence 801(d)(2)(D) and/or co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).

Federal Rule of Evidence 802(d)(2)(D) provides that a statement "made by [a] party's agent or employee on a matter within the scope of that relationship and while it existed" is admissible against that party. Statements by employees or other agents of the Blakley Clinics

regarding appointments or other activities at the clinics and products sold through the clinics meet this definition. *See, e.g.*, *United States v. Riley*, 621 F.3d 312, 338 (3d Cir. 2010); *United States v. Bhimani*, 492 F. Supp. 3d 376, 390 (M.D. Pa. 2020), *aff'd*, No. 22-1436, 2023 WL 5125056 (3d Cir. Aug. 10, 2023).

Federal Rule of Evidence 801(d)(2)(E) provides that "a statement made by a co-conspirator of a party during the course and in furtherance of that conspiracy" is not hearsay and may be admitted as evidence against a co-conspirator. In order for a court to admit the co-conspirator statements, the government must prove that: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; (3) the statements were made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy. *United States v. Bourjaily*, 483 U.S. 171, 175 (1987); *United States v. McGlory*, 968 F.2d 309, 333-34 (3d Cir. 1992); *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991).

The trial court may admit statements pursuant to the rule even if the statements relate to a conspiracy not charged in the indictment. *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998); *United States v. Trowery*, 542 F.2d 623, 626 (3d Cir. 1976). The rationale for this rule is that the co-conspirator provision in Rule 801(d)(2)(E) is merely a rule of evidence founded on the theory "that a person who has authorized another to speak or act to some joint end will be held responsible for what is later said or done by his agent." *Trowery*, 542 F.2d at 626.

In making a preliminary factual determination as to the existence of a conspiracy and the defendant's participation in it, courts may consider the offered hearsay statement itself. *Bourjaily*, 483 U.S. at 180-81. "[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Id.* at 180; *see also McGlory*, 968 F.2d at 334.

Moreover, the district court may consider the totality of the circumstances when deciding the admissibility of such evidence. "The circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement is made, or evidence corroborating the contents of the statement," should be considered by the trial court. *See* Fed. R. Evid. 801(d)(2) (Advisory Committee Notes). Furthermore, the existence of the conspiracy and the party's participation in that conspiracy need only be proved by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175.

The declarant need not be identified in order to admit the statement, as long as the court can determine that "the declarant, whoever [they are], was connected to [the defendant]." *United States v. Cruz*, 910 F.2d 1072, 1081-83, 1081 n.10 (3d Cir. 1990); *see also United States v. Mahasin*, 362 F.3d 1071, 1084-85 (8th Cir. 2004). "[W]hen the statement itself and the surrounding circumstances provide sufficient evidence of reliability, unidentifiability will not be particularly important." *Cruz*, 910 F.2d at 1081 n.10.

The Third Circuit has commented that the "in furtherance" requirement is to be given a broad interpretation. *United States v. Gibbs*, 739 F.2d 838, 845 (3d Cir. 1984); *United States v. DePeri*, 778 F.2d 963, 981 (3d Cir. 1985). Moreover, although the "during the course of" and "in furtherance" requirements do not overlap entirely, they are closely related. *United States v. Ammar*, 714 F.2d 238, 253 (3d Cir. 1983). While mere narratives of past events or mere idle chatter that has no current purpose do not generally occur in furtherance of the conspiracy, statements that "provide reassurance, serve to maintain trust and cohesiveness among co-conspirators, or inform each other of the current status of the conspiracy furthers the ends of the conspiracy." *Id*. at 252. For example, statements which are relevant to the distribution of the proceeds of the conspiracy are considered in furtherance of the conspiracy. *Id*. at 253. Further,

under Rule 104, a trial court may admit co-conspirator statements, subject to a later connection. *See Gambino*, 926 F.2d at 1360-61 (3d Cir. 1991); *see also Ammar*, 714 F.2d at 246-47; *United States v. Continental Group*, 603 F.2d 444, 456-57 (3d Cir. 1979). Such an approach avoids undue complexity and confusion for the jury. *Continental Group*, 603 F.2d at 457.

E.    **Testimony of Undercovers**

The government intends to call three witnesses who served in an undercover capacity during the investigation into the Blakley Clinics: (1) "Ali," who was, and is, employed as a Task Force Officer with the Federal Bureau of Investigation (the "FBI"), (2) "Paul," who was, and is, employed as a Special Agent with the FBI, and (3) "AJ," who was originally employed as a Special Agent with the FBI and, following his retirement during the course of the investigation, served as a Confidential Human Source (collectively, the "undercovers"). In recordings and documents that the government intends to introduce at trial, these undercovers are referred to by their undercover pseudonyms: Ali, Paul, and AJ. The defendants and their co-conspirators knew these undercovers by their pseudonyms: Ali, Paul, and AJ. Revealing the undercovers' true names could jeopardize ongoing and future investigations where they could act in their true, or undercover, capacities and could compromise their safety. Thus, during their testimony, the government will refer to these witnesses by their undercover pseudonyms and the defense should not be allowed to refer to them by their true names.[5]

While a defendant has a Sixth Amendment right to confront his accusers, permitting the undercovers to testify under a pseudonym, and relatedly, preventing the defendants from using the undercovers' true names during argument, cross-examination, or during their cases-in-chief

---

[5] The government has offered to provide defense counsel with the true names of these witnesses, with appropriate protective measures in place.

(if any), would not violate this Constitutional right. Although the Sixth Amendment's Confrontation Clause guarantees criminal defendants the right to cross-examine adverse witnesses, "this right is not absolute, and a trial court 'retain[s] wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the wPitness' safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Miah*, No. 21-CR-110, 2021 WL 5605088, at *3 (W.D. Pa. Nov. 29, 2021) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Accordingly, a defendant's right to know, much less use at trial, a witness's true identity is not absolute.

Protecting the true identities of the undercovers furthers the public's interests in protecting the witnesses' safety and preserving the integrity of ongoing and future investigations. *See Miah*, 2021 WL 5605088, at *3 (collecting cases). Using pseudonyms will further avoid confusing the jury as those pseudonyms are the names used throughout numerous recordings that the government seeks to admit at trial. Furthermore, the government is unaware of any reason that the undercovers' true names would affect their "credibility or knowledge regarding the subject of their testimony." *Id.* at *4 (quoting *United States v. Naseer*, 10CR19 (S-4), 2015 WL 13843166, at *3 (E.D.N.Y. Jan. 26, 2015) (finding an officer's "true name is immaterial to defendants' guilt or innocence")).

### F. Exhibits – Electronic Format and Duplicates

Many of the documents that the government intends to offer into evidence are photographs, photocopies, or scans of the original. Such copies are admissible pursuant to Federal Rules of Evidence 1002 and 1003. Rule 1003 provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of

the original or (2) in the circumstances if would be unfair to admit the duplicate in lieu of the original."

### G. Summary and Demonstrative Charts

The government intends to use summary charts at trial. Specifically, these charts will consist of summaries of voluminous records discussing: (1) names and business information associated with various entities under which the defendants did business; (2) the whereabouts of the defendants over time; (3) communication methods used by the defendants to conduct business, including subscriber records; and (4) information about orders and mailings made in furtherance of the scheme to defraud. The government does not intend to show all these documents and records to the jurors in their entirety as it would take an enormous amount of time and confuse them. Rather, the government will use charts to present voluminous evidence in an organized and comprehensible manner, focusing the jury on the evidence against the defendants that is relevant to the specific charges in this case. This will substantially streamline the presentation of evidence and assist the jury in examination of the evidence that will be introduced at trial.

Under Federal Rule of Evidence 1006, summary charts are admissible if they are based upon evidence that is: (i) voluminous, (ii) admissible, and (iii) available to the opponent. *See United States v. Velasquez*, 304 F.3d 237, 240 (3d Cir. 2002). The language of Rule 1006 "recognizes that it often takes a great deal of court time to introduce a legion of documents to establish a single point. As the Advisory Committee notes indicate, it would be a grueling waste of time to examine all of the underlying evidence in court, and hence charts and summaries are permitted." *United States v. Strissel*, 920 F.2d 1162, 1163-64 (4th Cir. 1990). Here, as noted above, the government will use summary charts that will be based on voluminous records. The charts will be based on various types of records including business records, public records of

various types, or non-hearsay records. These records are relevant and admissible and are either self-authenticating or will be authenticated by a relevant witness. Although much, if not all, of the evidence underlying the government's summary charts will be offered for admission, it is not necessary that all the evidence depicted in the charts be admitted as long as it is otherwise admissible. *See United States v. Hevener*, 382 F. Supp. 2d 719, 729 (E.D. Pa 2005) (citing *United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir. 1992)); *United States v. Manamela*, 463 F. App'x 127, 132 (3d Cir. 2012) ("Rule 1006 does not require that the underlying materials actually be admitted into evidence.").

The government may also rely upon demonstrative charts. Unlike summary charts (which are admissible as evidence in and of itself under Rule 1006, regardless of whether the underlying information or records have been admitted), demonstrative charts are allowed under Rule 611(a) to summarize or otherwise aid the jury's understanding of complex documents or testimony which have already been admitted into evidence. *See Pierce v. Ramsey Winch Co*., 753 F.2d 416, 431 (5th Cir. 1985) ("[I]t is critical to distinguish between charts or summaries as evidence and charts or summaries as pedagogical devices"). Under the rules, and even apart from Rule 1006, a trial court "has the discretion to permit the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence." *Id.*; *see also United States v. Bertoli*, 854 F. Supp. 975, 1053 (D.N.J.), *aff'd in part, vacated in part*, 40 F.3d 1384 (3d Cir. 1994) ("Where the summaries or charts are "pedagogical devices 'more akin to argument than evidence' [because] they organize the jury's examination of testimony and documents already admitted into evidence," they do not come within Rule 1006. . . . These pedagogical devices, unlike Rule 1006 summaries, are not evidence, but only a party's organization of the evidence already presented."). In this case, the charts will assist the jury in

understanding certain claims made by the defendants and their associates over time and interactions between the defendants and the undercovers, among other things. The government will provide any demonstrative charts that it intends to use to defense counsel sufficiently in advance of their use for the defense to conduct a meaningful review.

### H. Presence of Government's Representative During Trial

The government requests that all witnesses be sequestered except for one of the case agents, Special Agent Marcia Cook. Even though the government may call this case agent as a factual witness, case law permits her to remain in the courtroom as the government's representative. *United States v. Gonzalez*, 918 F.2d 1129, 1138 (3d Cir. 1990); *United States v. Mallis*, 467 F.2d 567, 568 (3d Cir. 1972).

### I. Use of Notes and Reports To Cross-Examine

The government has provided the defendants with a variety of reports of witness interviews by government agents, as well as the notes of some of these interviews. To the extent that the agents who prepared the reports testify, those notes and reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents. Under the Federal Rules of Evidence, however, these notes or reports may *not* be used to impeach the subject of the underlying interview unless the subject has somehow adopted the reports or notes. *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992). In *Almonte*, a Drug Enforcement Administration agent testified at trial about the post-arrest statements that he had obtained from two defendants who were being tried. *Id*. at 28. One defendant sought to cross-examine the agent with interview notes taken by an Assistant U.S. Attorney who had interviewed the agent. *Id*. at 28-29. The district court rejected the effort, and the Second Circuit affirmed, holding that the AUSA's notes were not the agent's statement, but merely a "third party's characterization" of the agent's statement, and therefore irrelevant to impeachment and consequently inadmissible:

> We have held, however, that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization. . . . Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words. The problem, in essence, is one of relevancy. If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

*Id.* at 29 (citation omitted). As a matter of evidence, the burden "of proving that notes reflect the witness's own words rather than the note-taker's characterization falls on the party seeking to introduce the notes." *Id.* Thus, a party seeking to use a report to impeach bears the burden of proving a rational basis for concluding that the report either was adopted by the witness or represents the verbatim transcript of the witness' statement. *See id.* at 30. In the absence of such proof, cross-examination from such reports or notes should be disallowed. *See United States v. Shoenborn*, 4 F.3d 1424, 1427-28 & n.3 (7th Cir. 1993). In this case, the defendants should not be permitted to use notes and reports to cross-examine the underlying subjects of those interviews.

## V.    <u>PROPOSED STIPULATIONS</u>

To streamline the trial for the Court's and jury's convenience, the government has proposed to the defense a number of stipulations that would reduce the number of witnesses the government calls in its case-in-chief and focus the testimony of other witnesses. The government will inform the Court of any agreed upon stipulations.

## VI.    <u>WITNESSES</u>

The government may call the following witnesses in its case-in-chief:

1.  Special Agent Marcia Cook, FBI;

2. Christopher Edwards-Terry, Computer Scientist, FBI;

3. Additional FBI agents and personnel who recovered or processed physical evidence, as needed;

4. A representative or representatives from the State Department;

5. A representative from the Department of Education;

6. A representative or representatives from the Department of Homeland Security, Customs and Border Protection;

7. FBI Undercover Employee known as "Ali";

8. FBI Undercover Employee known as "Paul";

9. FBI Confidential Human Source known as "AJ";

10. Dr. Arthur Simone, M.D., Ph.D., Senior Medical Advisor, Office of Unapproved Drugs and Labeling Compliance, Center for Drug Evaluation and Research, FDA;[6]

11. Dr. Traci Fox, EdD, R.T(R)(ARRT), RDMS, RVT, FSVU, Department of Medical Imaging and Radiation Sciences, Jefferson College of Health Professions;

12. Dr. Catherine Azar, M.D., Medical Oncologist and Hematologist, Arizona Blood & Cancer Specialists;

13. Toby Graff, CBET, Field Service Engineer and Biomedical Equipment Technician, Chesapeake Ultrasound Services, Inc.;

14. Ramon Huizar, Sales Director, Edan Diagnostics, Inc.;

15. Allen Ezell, Diploma Mill Consultant, Former FBI Special Agent;

16. Various clients of the Blakley Clinics, including, but not limited to: Scott Amend, Frank Elliott, Chelsi Kelly, Sheila Parry, Christine Patterson, Larie Patterson, Michele Rizzo, and Christa Weise-Amend;

17. Various associates of the defendants, including, but not limited to: Janmarie Lanzo, Steven Seely, Roxanne Seely, and Bee Just;

18. Representatives from the following institutions, among others: Merck & Co., MD Anderson Cancer Center, and the Karolinska Institutet;

---

[6] The government intends to provide expert disclosures to defense counsel for Dr. Simone, Dr. Fox, Dr. Azar, Mr. Graff, and Mr. Huizar by the deadline of January 1, 2026.

19. A representative from the Swedish National Police; and

20. Records custodians, as needed.

## VII.   **GOVERNMENT EXHIBITS**

The government will provide the Court and defense counsel an electronic copy of the government's exhibits prior to trial and a hard copy of the exhibits on the day of jury selection. The government intends also to display these exhibits electronically to the jury once admitted.

## VIII.  **LENGTH OF TRIAL**

The government expects that its case-in-chief will last approximately 8 days, following jury selection.

## IX.   **CONCLUSION**

The government respectfully requests leave to file such other and supplemental memoranda as necessary during the course of the trial.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Patrick Murray*
PATRICK MURRAY
Assistant United States Attorney
Chief, Economic Crimes Division

*/s/ Ruth Mandelbaum*
RUTH MANDELBAUM
Assistant United States Attorney

ALEXANDER B. BOWERMAN
Special Assistant United States Attorney

Date:  December 22, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Trial Memorandum has

been served by me, this date, by email or electronic filing upon the following persons:

Timothy Wright, Esq.

Megan Davies, Esq.

*/s/ Ruth Mandelbaum*
RUTH MANDELBAUM
Assistant United States Attorney

Date: December 22, 2025